IN THE MATTER OF THE EXECUTIVE COMMUNICATION OF THE 9TH OF NOVEMBER, A. D. 1868.

Sect. 8, Art. IV., of the Constitution provides that " a majority of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may compel the presence of absent members, in such manner and under such penalties as each House may prescribe."

1. The term "House" in this clause of the Constitution, when used in reference to the matter of quorum, means the entire number of which the Assembly or Senate may be composed. A quorum for the purposes of general legislation is not less than a majority of the whole number of which the " House " may be composed. Vacancies from death, resignation, or failure to elect, cannot be deducted in ascertaining a quorum.

2. To constitute an impeachment so as to be effective under the Constitution to suspend the officer, the articles of impeachment must be presented to the Senate, and a constitutional quorum of the Senate must receive them.

EXECUTIVE DEPARTMENT, }
TALLAHASSEE, 9th November, 1868. }

*To the Honorable the Justices of the Supreme Court of the State of Florida:*

As Governor of the State of Florida, I hereby, under and in pursuance of the sixteenth section of the fifth article of the Constitution of the State, require the opinion of your Honors as to the interpretation of certain portions of said Constitution, and upon certain points of law hereinafter mentioned and stated, and respectfully request that you render me such opinion in writing.

For the information of your Honors, I present herewith a copy of the proceedings of the Joint Legislative Convention, begun and held at the Capitol, in the city of Tallahassee, on the third day of November, in the year of our Lord one thousand eight hundred and sixty-eight, pursuant to adjournment, and in accordance with the provisions of An Act entitled " An Act prescribing on the part of this State the manner of appointing Electors of President and Vice-President of the United States," approved August 6th, 1868, marked Exhibit "A," and a copy of what purports to be a " Senate Journal, at an Extraordinary Session of the Legislature convened at the Capitol, at Tallahassee, Florida, on Tuesday, the 3d day of November, A. D., 1868, at eight o'clock, P. M., by virtue of a proclamation of the Governor," marked Exhibit " B," and a copy of what purports to be a " Journal of the Assembly, at an Extraordinary Session of the Legislature convened at the Capitol, at Tallahassee, Florida, on Tuesday, the 3d day of November, A. D. 1868, at eight o'clock, P. M., by virtue of a proclamation of the Governor," marked Exhibit " C," which said Exhibits A, B, and C, I respectfully ask may be taken and considered as a part hereof.

Article III., on " Distribution of Powers," provides : " The powers of the government of the State of Florida shall be divided into three departments, to wit: Legislative, Executive, and Judicial, and no person properly belonging to one of the depart-

ments shall exercise any functions appertaining to either of the others, except in those cases expressly provided for by this Constitution."

Section 1, of Article IV., of the Constitution provides that "the Legislative authority of this State shall be vested in a Senate and Assembly, which shall be designated the Legislature of the State of Florida, and the sessions thereof shall be held at the seat of government of the State," and section 8 of the same article provides that "a majority of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may compel the presence of absent members in such manner and under such penalties as each House may prescribe."

Section 8, of Article V., of the Constitution provides: "The Governor may on extraordinary occasions convene the Legislature by proclamation, and shall state to both Houses, when organized, the purposes for which they have been convened, and the Legislature then shall transact no legislative business except that for which they are especially convened, or such other legislative business as the Governor may call to the attention of the Legislature while in session, except by the unanimous consent of both Houses."

An interpretation of these several provisions of the Constitution is required in order to determine:

First. Whether a Legislature of the State of Florida, consisting of a "Senate" and "Assembly" vested with the legislative authority of the State, has convened in Extraordinary Session under the proclamation of the Governor of November 3d, A. D. 1868.

Upon this point, to assist your Honors in interpreting said provisions of the Constitution with reference to the facts, I refer your Honors more particularly to Exhibit "B," or "the Journal of the Senate," from which it will be seen that the Senate, as a co-ordinate branch of the Legislature of the State, had not, at any time, since it assumed to do business in conjunc-

tion with the Assembly, under said proclamation, a quorum consisting of a majority of its members. That I called the attention of the Senate and Assembly, as soon as the official records disclosed the same, to this fact in my message to them of November 3d, which message appears in said exhibit "B." That certain persons who assumed to act as Senators, to wit: George J. Alden, Horatio Jenkins, Jr., C. R. Mobley, and Robert Meacham, had, before assuming so to act, vacated their positions as Senators, and their seats in the Senate had been declared vacant by "proclamation for and notice of election" of 28th October, A. D. 1868, duly made and published, and a copy of which "proclamation," marked Exhibit "D," is presented herewith to be taken and considered as a part hereof. That, excluding said persons who had assumed so to act as Senators, there were in the Senate only eight Senators whose names appear upon the Senate Journal, to wit: Messrs. Ginn, Katzenberg, Krimminger, Moragne, Underwood, Smith, Bradwell, and Pearce.

It is provided in section 29, of Article XVI., of the Constitution, that "there shall be twenty-four Senatorial Districts." The Senate, therefore, as one of the "*Houses*" of the Legislature, being composed of *twenty-four Senators*, cannot without a *majority* constitute a *quorum* to do business, and any legislative business transacted by it with eight members, which is five less than a majority, is clearly without constitutional sanction and is void.

If your Honors, in interpreting said provisions of the Constitution, should give me the opinion that there has not convened under said proclamation in Extraordinary Session, a Legislature of the State, consisting of a Senate and Assembly, vested with the legislative authority of the State, competent to transact legislative business, it would be unnecessary to trouble you further; but if your opinion be otherwise, then I present for your interpretation and opinion:

Second. Admitting, under the several provisions of the Con-

stitution referred to, that a Legislature of the State, consisting of a Senate and Assembly duly organized and vested with the legislative authority of the State, had convened in Extraordinary Session under the proclamation aforesaid, and were, under the Constitution, competent to transact legislative business, are the proceedings of said Legislature, as shown by said Exhibits B and C, in so far as they relate to my impeachment as Governor of the State of Florida, of constitutional validity of force, and am I, under section 15, of Article V., and section 9, of Article XVI., disqualified from performing the duties of my office, by reason of the proceedings had and taken as aforesaid in reference to my impeachment ?

Upon this point I respectfully refer your Honors to my proclamation of November 3d, A. D. 1868, concerning said Extraordinary Session, and to my message of same date, addressed to the Senate and Assembly, both of which appear in said Exhibits B and C, and present for your consideration the fact that neither in said proclamation or message is it stated, or can it be implied, that among the purposes for which said Legislature was convened was my impeachment. Nor have I called to the attention of said Legislature, while in session, any other legislative business than that for which they were especially convened by said proclamation, and mentioned in said message.

I further present for the consideration of your Honors, that the Assembly, in originating and bringing before itself and Senate these impeachment proceedings, were acting in their legislative capacity, and the members thereof sitting as legislators; and that in so doing they were transacting legislative business other than that for which they were especially convened, and this, too, without the unanimous consent of both Houses, to wit: of the Assembly and Senate, all which will more fully appear by reference to said exhibits B and C.

It should be *affirmatively* shown by said Exhibits B and C that such *unanimous* consent was first had and obtained, and if it should be made to appear that objection was made to the

transaction of any other legislative business than that for which said Extraordinary Session was especially convened, I not only call your Honors' attention to said Exhibit " C," where objection does so appear to have been made by a member of the Assembly, but to the accompanying affidavits, marked Exhibit " E," and which I respectfully ask may be taken and considered as a part hereof.

In asking the opinion of your Honors upon the grave questions above submitted, I feel it my duty to bring to your attention the fact—that upon said proceedings for my impeachment, the Lieutenant-Governor of this State, William H. Gleason, has at once assumed to be the Acting Governor thereof; that said Gleason has issued a proclamation as such Acting Governor, a copy of which is herewith filed, marked " F," and which I ask may be taken and considered as a part hereof; that I am still in possession of the Executive Chamber, in the Capitol of the State; that said Gleason, as acting Governor as aforesaid, has demanded of me the surrender of the Executive Department. This demand I refused, stating to him that I claimed to be, under the Constitution and laws of this State, the rightful Governor thereof; that I should continue to exercise all the power and authority, and discharge all the duties belonging to the Executive Department until the courts should determine otherwise; that should the judicial tribunals of the State determine against me, I should, like any other good citizen, not only render peaceful but immediate obedience; that I am continuing to act as Governor, and that said Gleason is also assuming to act as Governor; that the officers of the State do not know, in this unsettled and anomalous condition of things, whom to recognize as at the head of the Executive Department; that the administration of the State government is obstructed, and the peace and welfare of the whole State jeoparded. It is but natural that I should, therefore, under such circumstances, seek your counsel and opinion at the earliest moment, and you will pardon me for urging you, in view of the possibly momentous

results of these issues, to furnish me your opinion at the earliest practicable moment.

I will state, in conclusion, that I have foreborne, as I felt it my duty to do, to bring to your notice any matter of political controversy, and I will add, that if, in your opinion, it is proper to give Lieutenant-Governor Gleason notice of this paper, to the end that he may, as a party in interest, be represented before your Honors, you can direct the clerk of the court to hand him a copy hereof, if he will consent with me to submit the matter to you, and be bound by your opinion to be given in the premises. Should you desire it, I will appear before you by counsel, at such time as your Honors may be pleased to designate. HARRISON REED,
Governor of Florida.

*To the Honorable the Justices of the Supreme Court of the State of Florida :*

I would respectfully inform your Honors that I have received a copy of the communication, bearing the seal of the Supreme Court, of Harrison Reed, Governor of Florida, asking the opinion of your Honors upon certain points as connected with the impeachment of Harrison Reed, Governor of Florida, by the Assembly of the State, and in reply would say :

That the journal of the Assembly shows that he was legally impeached for high crimes and misdemeanors in office, and that a presentment of the impeachment was formally and legally made to the Senate, and the Senate formally and legally agreed to entertain and take action in the matter, as is shown by the journal of the Senate. Consequently, the entire matter of the impeachment of Harrison Reed, Governor of Florida, is before the Senate in its judicial capacity as connected with the Assembly in its appropriate capacity, it having the sole power of impeachment.

As no other court than the Senate of the State has any jurisdiction whatever in matters of impeachments, and as there is no question or interpretation, or constitutional or statute law involved, but only a question of fact as to the retention by Harrison Reed, Governor, of the possession of the Executive Chamber and the Archives of the State, after his formal impeachment by the Assembly, and the recognition of myself as Lieut. and acting Governor by both bodies of the Legislature, I do not perceive how any question connected with the matter of impeachment can possibly be submitted to your Honors for a legal opinion under the provisions of Article V., Section 16, of the Constitution of the State. Therefore, having no power to do so, I most respectfully decline to submit any question connected with the matter of impeachment to your Honors, even while I hold the opinions of your Honors upon all proper questions and matters in the highest possible estimation.

[Signed,]                W. H. GLEASON,
Lieutenant and Acting Governor.

SUPREME COURT OF FLORIDA, }
TALLAHASSEE, Florida, Nov. 24, 1868. }

To his Excellency, HARRISON REED, Governor of Florida :

SIR : Your communication of the 9th of November is received. It is accompanied by exhibits consisting of your proclamation of the 3d of November, calling an extraordinary session of the Legislature ; of what purport to be Journals of the Senate and Assembly at such session, and a proclamation of your Excellency containing notice for an election to fill certain vacancies alleged to exist in the Senate and Assembly, occasioned by parties who were elected to seats in the Legislature having subsequently accepted offices and exercised functions appertaining to the Executive and Judicial departments of the Government.

You present for our consideration several "points of law," and require of us an opinion upon two questions involving the interpretation of several clauses of the Constitution of this State.

The first question is—Whether, upon the facts appearing in your communication, a Legislature of the State of Florida, consisting of a Senate and Assembly, vested with the legislative authority of the State, has convened in extraordinary session under your proclamation of November 3d, 1868 ?

The second question is—If such a Legislature has assembled, "are the proceedings," as shown by exhibits B and C, in so far as they relate to your impeachment as Governor of the State of Florida, of constitutional validity and of force, and are you, under section fifteen of Article V., and section nine of Article XVI., disqualified from performing the duties of your office by reason of the proceedings had and taken in reference to your impeachment ?

An answer to the second question is not required by your Excellency in the event that a negative reply is given to the first, your Excellency having in substance remarked that in case our opinion is that a Legislature of the State of Florida did not convene, it would be unnecessary that the court should proceed further; but if the opinion of the court is otherwise, then you present the second question for consideration.

Before expressing an opinion upon the question propounded, it may be well to determine whether there is anything in the character of the opinions required which would authorize the court to decline to act in the premises. The Governor of this State is authorized to require opinions of this court by virtue of the following clause in the Constitution of the State :

Section 16, Article V.  "The Governor may at any time require the opinion of the justices of the Supreme Court as to the interpretation of any portion of this Constitution or upon any point of law, and the Supreme Court shall render such opinion in writing."

This clause has not been embraced in the antecedent Consti-

tutions of this State, and we must look to other State Constitutions having similar provisions to obtain an idea of the practice under it.

An almost entirely similar clause is found in the constitutions of Maine, New Hampshire and Massachusetts. The character of questions considered by the courts of these States, in answer to inquiries made, will show to what extent the courts of these States have gone, and will indicate whether they have at any time felt justified, on account of the character of the questions submitted, to decline to make a reply.

In 3d Greenleaf, 447, we find that the opinion of the Supreme Court of Maine upon the construction of the following section in the Constitution of that State was required : "The number of Representatives shall, at the several periods of making the enumeration, be fixed and apportioned among the several counties as near as may be according to the number of inhabitants, having regard to the relative increase of population." Here a construction was desired of a clause which in part relates to the exercise of a purely legislative discretion.

It will not be denied that a judicial tribunal cannot review or control a purely legislative discretion. In a constitutional government such as ours, all departments are limited in their powers by the Constitution ; each being independent, are severally supreme within their legitimate and appropriate sphere of action ; and while it is unquestionably true that wherever a power and trust is expressly confided to one co-ordinate branch of the government, neither of the others, in a government with constitutional restrictions similar to those contained in ours, can exercise any supervisory control over the other departments when acting within the limits of their constitutional power, yet we see in this instance that the " Supreme Judicial Tribunal " of Maine did not hesitate to give a construction to this clause in the Constitution as requested.

In 3d Greenleaf, 481, the following question was submitted : " Is the office of agent, appointed under a resolution authorizing

the Governor to appoint one or more agents for the preservation of timber upon the public lands, a civil office of profit within the meaning of Article IV., part 3, section 10 of the Constitution, so that no Senator or Representative of the present Legislature can constitutionally be appointed as agent ?"

In 3d Greenleaf, 481, the following question is asked : " Can any person, according to the third article of the Constitution, hold and exercise at the same time the several offices of deputy sheriff and justice of the peace ?"

In 6th Greenleaf : " Do the executive duties of the State, when constitutionally exercised by the President of the Senate, devolve at the end of the political year when so exercised on the President of the Senate or Speaker of the House of Representatives of the next political year, whichever shall be first chosen, or shall such executive duties still continue to be exercised by such President of the Senate until another Governor of the State chosen by the people or by the Legislature be qualified ?"

Here was a question propounded which settled a matter of controversy in that State, involving the question as to who was the Governor.

The question was asked with reference to a clause in the Constitution of that State, which was as follows : " Whenever the office of Governor shall become vacant by death, resignation, removal from office or otherwise, the President of the Senate shall exercise the office of Governor until another Governor shall be duly qualified." There was a further provision to the effect that a President of the Senate should be elected for the *term of one year*.

Hon. Nathan Cutler had been elected for the year 1829, and had discharged the duties of the office of Governor during that year, there being a vacancy in the office of Governor. Another President was elected for the year 1830. Under these circumstances, Hon. Nathan Cutler, Acting Governor, whose term as President of the Senate had expired, addressed a communication to the Justices of the Supreme Court of that State and pro-

pounded the question above set forth. The Justices, with the exception of one, advised him that he was not authorized to act longer as Governor.

Other citations showing the extent to which the courts have gone in opinions of this character, are 7th Greenleaf, 482 ; 16 Maine, 474 ; 35 Maine, 585 ; 35 N. H., 578.

In the case first cited, one of the questions asked was, whether, " on the statement of facts made, Messrs. Appleton, Bodwell, Usher and Hill were constitutionally entitled to retain their seats in the Senate ?" In giving their opinion the Justices remark, " The returns of votes are before the Senators, and their decision upon them will of course be in accordance with the Constitution as understood and construed by the court."

It will be perceived that the Justices in this case go so far as to say that the Senate in making its decision must construe the Constitution in accordance with the opinion of the court, thus intimating that their opinion interpreting a clause in the Constitution as to the manner of exercising a power vested exclusively in the Senate, was a law to the Senate itself, in its action.

These precedents show that there is no power in the court to decline to give an opinion upon questions submitted by the Executive in so far as the act of giving such opinion, whenever they have been required, goes to establish the rule.

Whilst I have been thus careful to cite at some length the practice of the courts, to show their uniform course of action in other States with similar constitutions, yet I do not think that this clause in our constitution vesting this power admits of doubt as to its construction. Its language is—" The Governor may at *any time* require the opinion of the justices of the Supreme Court as to the interpretation of any portion of this Constitution, or upon any point of law, and the Supreme Court shall render such opinion in writing."

It is evident from the language used that there is a discretion vested in the Governor as to requiring opinions, and it is equally

plain that there is no discretion in the court, if the opinion required involves, upon a given state of facts, an interpretation of any portion of the Constitution or the expression of an opinion upon any point of law.   The language is : " The Governor may *require* an opinion, and the Supreme Court *shall* render such opinion."

While this is true as to the duty of the court in reference to such communications from the Executive, it is equally true that it is not its duty to render opinions of this character to any other officer of the Government except the Governor, or to the person upon whom the functions of the executive office may at any time devolve by reason of suspension, by impeachment, or any other disability within the meaning of the constitutional provisions upon this subject.   To answer this communication is, therefore, *pro tanto*, a recognition of its writer as the Constitutional Governor of Florida—to decline to answer it, is no less than a refusal so to recognize.   This dilemma has been a source of no little embarrassment.   The writer of the communication has been exercising the functions of the office of Governor from the organization of the Government of this State under the Constitution of 1868 up to this time, his term of office under the Constitution has not expired, and he is now, whether rightfully or wrongfully, in the exercise of the duties of the office.   It is true the communication and exhibits attached, bring to the attention of the court certain proceedings, looking to impeachment, but after mature reflection as to the duty of the court in the premises, I think that an opinion should be rendered.

While I do not think that because the opinions required by the Governor may be upon points of law likely soon to be passed upon by the court in cases involving individual rights, relieves the court from its duty under the Constitution, this being, if a fault, a fault of the Constitution beyond the power of the court to remedy, yet not being required by the communication to pass upon the question alluded to (the question of impeachment), in the event that a negative answer to the first question is given, I shall not consider it.

54

I now proceed to the consideration of the first question as to which an opinion is required, with the remark that in passing upon any communication of this character, the facts therein stated must be accepted as true, and the points of law arising therefrom, and in reference to which our opinion is required, must be passed upon in this view. No case being before the court in the exercise of original jurisdiction, no evidence can be introduced ; there are no pleadings raising issues, and hence nothing to be proved.

The question is : Upon the facts appearing from your communication and exhibits, did a "Legislature of the State of Florida, consisting of a Senate and Assembly, vested with the legislative authority of the State, convene in extraordinary session under your Proclamation of November 3, 1868 ?"

What are the facts with reference to which this question is asked, and the points of law which are involved, to be determined ?

It appears affirmatively from the Journal of the Assembly that there were present on the 3d of November forty members, on the 4th of November thirty-four members, on the 5th of November thirty-one, on the 6th of November thirty, and on the 7th of November thirty-four members.

So far then as the Assembly is concerned, there was a quorum present, whatever construction may be given to the requirement of the Constitution, to the effect that " a majority of *each* House shall constitute a quorum to do business;" but as, to constitute a "Legislature of the State of Florida vested with legislative power," (the point to which your inquiry is directed,) it is necessary that a quorum of the Senate within the meaning of the constitutional requirement recited should be present, I address myself to this specific inquiry : Was there a constitutional quorum of the Senate for the purpose of general business, present at any time during this session ?

What are the facts ? As they appear from your communication, and so far as they appear affirmatively from the Journals

of the Senate, (which is a requirement according to decision in People vs. Hatch, 33d Ill., 156,) the highest number present at any time was twelve, and the right of four of these is questioned, upon the ground that since their election as members of the Legislature they accepted and entered upon offices incompatible with legislative functions, thus coming, as is claimed, within that clause of the Constitution of this State which provides that "no person properly belonging to one of the departments of Government shall exercise any functions appertaining to either of the others;" it being claimed that the rule of law applicable to such a case is :  The citizen occupying a position in one department of the Government, and being appointed or elected to another, the duties of which are incompatible with the first, is at liberty to accept and qualify and to discharge the duties of the last position; that he is free to elect which he will have, and that his acceptance of the second office is the election of that office, and the legal effect is the vacation of the other, whether by formal resignation or not.

Such a doctrine has been held in many of the States, New York, Massachusetts, Rhode Island, and Maine, and in the case of Colonel Yell, of Arkansas, (a legislative precedent, 29th Congress, 2d session,) the question was, admitting that he could not hold the position of a Representative in Congress and colonel of volunteers of the United States army at the same time, at what time did he *vacate* his office as representative ?  The decision was, so far as one was made, that there *existed a vacancy* from the date of the acceptance by him of the commission as colonel.

As the greater number embraces the smaller, I shall, under our Constitution, (without regard to the special Representative,) address myself to the following question :

Are twelve Senators a constitutional quorum of the Senate of this State, for the purpose of general legislative business, as contradistinguished from its power to punish for contempts, to examine returns, to compel the attendance of absent members, and other powers necessary to its organization ?  The whole number

of the Senate, excluding the special Representative, is twenty-four. If no less than a majority of the whole number is a quorum, then the least number constituting a quorum is thirteen. Is there anything in our Constitution, or legislative precedent, or judicial decisions, to authorize in estimating a quorum a deduction to be made for vacancies by death, resignation, expulsion, failure to elect, or other cause of this character? While the constitutional provisions on this subject are by no means the same, but on the contrary there is a very great difference, it may be well to institute a comparison between the provisions of the Constitution of the United States and the Constitution of this State, and examine the precedents, as this will enable us perhaps to come to a more correct conclusion.

I shall consider the Constitution of this State without reference to sections 7 and 8, Article XVI. Its provisions are:

Section 29, Article XVI. "There shall be twenty-four Senatorial Districts, which shall be as follows, and shall be known by their respective numbers from one to twenty-four, inclusive. The First Senatorial District shall be composed of Escambia county, the second of Santa Rosa and Walton," and so on, enumerating each Senatorial District, including the twenty-fourth. It provides further that "each Senatorial District shall be entitled to one Senator."

Section 8, Article IV. "A majority of each House shall constitute a quorum to do business."

Section 1, Article IV. "The legislative authority of this State shall be vested in a Senate and Assembly, which shall be designated the Legislature of the State of Florida."

The provisions of the Constitution of the United States are:

Section 2, Article I. "The House of Representatives shall be composed of members *chosen* every second year by the people of the several States."

Section 3, Article I. "The Senate of the United States shall be composed of two Senators from each State, *chosen* by the Legislature thereof."

Section 5, Article I. "A majority of each House shall constitute a quorum to do business."

The language of the Constitution of this State and of the United States, in so far as that a majority of each House is required to constitute a quorum to do business, is precisely similar, but when we come to define the words "each House" and construe the several articles with reference to its definition, the difference is marked. We have in the Constitution of this State, when we come to define the word "House," so far as the Senate is concerned, the following: "There shall be twenty-four Senatorial Districts, and each Senatorial District shall be entitled to one Senator."

We have in the Constitution of the United States when we define the word "House," as to the House of Representatives, "The House of Representatives shall be composed of members *chosen* every second year," &c.

As to the Senate, "The Senate of the United States shall be composed of two Senators from each State *chosen* by the Legislature thereof."

The word "*entitled*," with reference to this subject, occurs in the Constitution of the United States in but one place, and that is, in reference to the representation which the States were to have in the House of Representatives anterior to the first census, and hence any decision as to what constituted a quorum of the House of Representatives of the United States, after the first census was completed, was made without reference to the word "entitled" in this clause, the whole clause having become inoperative.

All decisions, therefore, made after the first census, were made only with reference to the terms, "The House of Representatives shall be composed of *members chosen* every second year," &c.

What are the legislative precedents?

The first I will mention was during the war. Journals of the House of Representatives, 37th Congress, 117.

The House of Representatives then, in view of the clauses I have cited above, decided "several of the States *having failed to send Representatives*, that a majority of the *members chosen* constituted a quorum to do business."

This ruling, in my judgment an incorrect one, because the word "chosen," in the connection in which it is used, has exclusive reference to the time of election, was based upon a state of facts then existing in the United States, which do not now exist in the Senatorial Districts of Florida. At this time some of the States had refused to send members to Congress, and their citizens were in arms against the government of the United States. Admitting, however, that such a construction is correct when applied to the terms used in the Constitution of the United States, the language being "the House of Representatives shall be composed of members *chosen*," the case is not at all in point when we are to *construe* the Constitution of this State, where, in reference to the Senate, there is no such word as chosen except when used to fix the duration of their term, and where no Senatorial District has failed to elect a Senator when an opportunity has been afforded.

The word "chosen" in the Constitution of this State is used solely in reference to the term of office and date of election.

The word "*entitled*" in the Constitution of this State is used with reference to a subject that does not vary, to wit, a Senatorial District, and if the word *House* is to be construed with reference to this term, which it must be in the connection in which it is used, it should indicate a fixed, a certain number. The term "*chosen*," used in the Constitution of the United States, implies, indeed admits, the idea of a right of choice when used with reference to a person or "member;" the word "entitled" in our Constitution is used in reference to a fixed subject, such as a Senatorial District, and involves no such idea even in the most limited degree.

Leaving this precedent, applicable to a particular state of facts not now existing in the State of Florida, we come to a pre-

cedent somewhat more in point, although not entirely on account of difference in the constitutional provisions.

Congressional Globe, volume 18, page 821 :

" Mr. Jones, of Tennessee, raised a question of order. He contended that one hundred and fourteen members did not constitute a quorum of the House. . Two members had been elected to represent the State of Wisconsin, one of whom had appeared and been this morning sworn, and the other was on his way. Counting these two members, the House would consist of two hundred and thirty members, and it would of course take one hundred and sixteen to make a quorum.

" The Chair stated that he had been informed by the clerk that one hundred and fourteen were a quorum. The clerk being permitted to explain, said that including the two members from Wisconsin there would be two hundred and thirty members, but there *were three vacancies to be deducted.* This being done, one hundred and fourteen would constitute a quorum.

" Mr. Jones denied that the vacant districts were to be deducted.

" Mr. Duer contended that the vacant districts ought not to be included in determining the number of which the House consisted, and that none ought to be taken into account but those actually elected and returned."

The chair ruled that the vacant districts *were to be included* in the account.

It will thus be seen that upon that day, including the two members from Wisconsin, the House would have been composed of two hundred and thirty members, including three vacancies; and excluding the three vacancies, that is, seats for which members *were not chosen,* the House would have been composed of two hundred and twenty-seven members, and one hundred and fourteen would have, with this construction, been a quorum.

The point was here raised expressly that the vacancies should not be counted in estimating a quorum, and it was decided that they should be.

Cushing's Law and Practice of Legislative Assemblies, 100:

"When the number of which an Assembly may consist at any given time is fixed by the Constitution, and an aliquot proportion of such an Assembly is required in order to constitute a quorum, the number of which such Assembly *may consist*, and not the number of which it does in fact consist at the time in question, is the number of the Assembly, and the number necessary to constitute a quorum is to be reckoned accordingly." J. of H., VI., 274–395 ; J. of H., VII., 214.

"Thus, in the Senate of the United States to which, by the Constitution, each State in the Union may elect two members, and which may consequently consist of two members from each State, the quorum is a majority of that number, whether the States have all exercised their constitutional right or not." J. of S., 32d Congressional Globe ; Congressional Globe, X., 1.

"So in the second branch of Congress, in which, by the Constitution, the whole number of Representatives of which the House may consist, is fixed by the last appointment, increased by the number of members to which newly-admitted States may be entitled, the quorum is a majority of the whole number, including the number to which such new States may be entitled, whether they have elected members or not, making no deduction on account of vacant districts." J. of H., 30th Congress, 1st Session, 877 ; Congressional Globe, 18–821.

In examining this question I have given citations showing legislative practice. This is a question of constitutional law. The action of Legislative Assemblies, and especially the popular branch, is not authority in the legal sense of that word, that is, the authority which attends a judicial decision. It is seldom a safe criterion, and I should not hesitate to depart from it if I thought it wrong. The question here is an original one.

The judicial decisions in all the States whose courts have passed upon the subject, so far as I have been able to obtain them, define a quorum to be a majority of all the members that *may* be elected, including casual vacancies.

Section 12, Article III., of the Constitution of Illinois, requires that "two-thirds of each House shall constitute a quorum," and "the Senate shall consist of twenty-five members."

In examining the Constitution as to what constituted a quorum of the Senate under these constitutional provisions, the Supreme Court of Illinois, in the case of People vs. Hatch, 33d Ill., 130–159, held it to be 17.

Constitution of Maine.—"The Senate shall consist of not less than twenty nor more than thirty-one members elected at the same time as the Representatives."

"A majority of each House shall constitute a quorum to do business."

In 6th Greenleaf, 515, the court held a "Senate cannot exist for the purpose of doing business, unless composed of eleven Senators at least, and such Senate can act only by vote, and decide only by the power of a major of the constitutional quorum."

If such a construction was given to this clause in our Constitution as would permit the word House to be modified in its meaning by casual circumstances resulting in vacancies, such a result is possible as would vest the entire powers of the Legislative Department of the government in less than one-third of the members for which the Constitution provides.

There is as much reason under our Constitution for ruling that the term House means the members present, whether they be three or six, as there is for deciding that vacancies should be deducted where there are vacancies from death, resignation, or a failure to elect, when there has been no opportunity afforded to elect.

The meaning of the word "House," as used in the clause of the Constitution under consideration, does not depend on such contingencies. It has a fixed meaning under all circumstances, which is, the entire number of which it *may be composed*, and a constitutional quorum must be a majority of that number.

It is, therefore, my opinion, upon the facts submitted in your

communication and upon the authorities and precedents cited, that twelve Senators did not constitute a quorum to do business ; and hence, that there was no Senate within the meaning of this clause of the Constitution, and that " a Legislature of the State of Florida, consisting of a Senate and Assembly, vested with the legislative authority of the State," did not convene in extraordinary session under your proclamation of November 3, 1868.

As your Excellency does not require an opinion upon the points submitted in your second question, if a negative reply is returned to the first, having made such a reply I do not consider the second question.

JAMES D. WESTCOTT, JR.,<br>Associate-Justice Supreme Court.

Opinion by E. M. RANDALL, C. J., in reply to the letter of the Governor, of November 9, 1868:

To His EXCELLENCY, the Governor:

As pertinent to the first question proposed by the Governor, and fully embraced in its scope, it is deemed proper to give the result of our examination of authorities and our conclusions therefrom, based upon the facts as stated in his communication and in the documents presented therewith, upon the important question as to what constitutes an effective impeachment and suspension from office under the Constitution. In view of its importance, we have no hesitation in doing so, and in view of the further fact that we find no actually conflicting decisions or varying precedents.

Concurring fully in the views expressed by Justice Westcott, the following are respectfully submitted, with the premise that the rules which have governed courts and deliberative bodies, through a long series of years, are much more satisfactory to ourselves than our own speculations and first impressions.

I. " An impeachment before the Lords by the Commons of Great Britain, *in Parliament*, is a prosecution of the already known and established law, and has been frequently put in practice; *being a presentment to* the most high and supreme court of criminal jurisdiction *by* the most solemn grand inquest of the whole kingdom." Blackstone's Com., Chap. XIX., 259 ; 1 Hale, P. C., 150.

Rawle on the Constitution, Chap. XXI., says, after quoting the provisions of the Constitution on the subject: " Impeachments are thus introduced as a known definite term, and we must have recourse to the common law of England for the definition of the term. In England, the practice of impeachments *by* the House of Commons *before* the House of Lords has existed from very ancient times. That branch of the Legislature which represents the people, brings the charge before the other branch." Burrill's Law Dict., title Impeachment, says, to impeach is *to exhibit* articles of accusation against a public officer *before* a competent tribunal.

Macaulay, referring to the impeachment of Warren Hastings, says: " At length the House, having agreed to twenty articles of charge, directed Burke *to go before the Lords and to impeach* the late Governor-General of high crimes and misdemeanors."

" Under the Constitution and laws of the United States, an impeachment may be described to be a written accusation, by the H. of R. *to the Senate*, against an officer. The mode of proceeding in the institution of an impeachment is as follows :

" When a person who may be legally impeached has been guilty, or is supposed to be guilty, of some malversation in office, a resolution is generally brought forward by a member of the House of Representatives, either to accuse the party or for a committee of inquiry. If the committee report adversely to the party accused, they give a statement of the charges, and recommend *that he be impeached ;* when the resolution is adopted by the House, a committee is appointed *to impeach the party at the*

*bar of the Senate,* and to state that the articles of impeachment will be exhibited in due time, and made good before the Senate, and to demand that the Senate take order for the appearance of the party to answer to the impeachment.　The House then agree upon the articles of impeachment, and they are presented to the Senate by a committee appointed by the House to prosecute; the Senate then issues process summoning the party to appear at a given day before them to answer the articles."　Bouvier's Law Dict., title Impeachment.

On the 5th day of January, 1804, Mr. Randolph demanded an inquiry by the House of Representatives, of which he was a member, into the official conduct of Samuel Chase, a Justice of the Supreme Court of the United States, and introduced a resolution to appoint a committee for that purpose.　The resolution was passed, a committee appointed, and a report, made subsequently, concluded with a resolution "that Samuel Chase, Esq., an Associate Justice of the Supreme Court, *be impeached* of high crimes and misdemeanors."　The report was accompanied by a great mass of printed documents and depositions, and on the 6th of March the resolution was adopted by the House; "whereupon it was ordered that Mr. Randolph and Mr. Early be appointed a committee *to go to the Senate, and at the bar thereof,* in the name of the House of Representatives and of all the people of the United States, *to impeach* Samuel Chase, an Associate Justice, &c., of high crimes and misdemeanors."

In the case of Judge Peck, in 1826, similar proceedings were had in the House, and the report of the committee concluded as follows : "That in consequence of the evidence collected by them, in virtue of the powers with which they have been invested by the House, and which is hereunto subjoined, they are of opinion that James H. Peck, Judge of the District Court, &c., *be impeached* of high crimes and misdemeanors."　Whereupon a resolution was adopted in the precise words used in the case of Judge Chase, and thereupon the House "ordered that a committee *go to the Senate, and at the bar thereof,* in the name of the

House, &c., *to impeach* James H. Peck, Judge, &c., of high crimes and misdemeanors in office."

In the case of Andrew Johnson, President, precisely similar preliminary proceedings were had in the House, and on the report of the committee, the House " *Resolved,* That Andrew Johnson, President of the United States, *be impeached* of high crimes and misdemeanors in office." Thereupon a committee was directed *to go to the Senate, and at the bar thereof to impeach* Andrew Johnson, President, &c., of high crimes and misdemeanors in office," and that a committee be appointed to prepare and report particular articles of impeachment.

In these cases, and in all others of which a record can be found, the journal of the Senate shows that the committee in each case appeared *at the bar of the Senate,* and announced that " in obedience to the order of the House of Representatives, *we appear before you, and in the name of the House of Representatives, &c., we do impeach,*" &c. Such has been the uniform course pursued in every case of impeachment by the House of Representatives, or the Assembly of any State, whenever an impeachment has been prosecuted.

It thus appears by ample precedent and authority, that an impeachment is not simply the adoption of a resolution *declaring that a party be impeached,* but that it is the *actual* announcement and declaration of impeachment *by the House* through its committee *at the bar of the Senate, to the Senate,* that it does thereby impeach the officer accused, which proceeding is at once recognized by the Senate.

The Assembly of Florida, on the 6th day of November, 1868, upon the declaration of a citizen, that Governor Reed has been guilty of crimes and misdemeanors, immediately " *Resolved,* That Harrison Reed, Governor of Florida, be, and HE IS HEREBY, impeached of high crimes and misdemeanors in office." This was immediately followed, however, by a resolution that a committee of three be appointed *to go to the Senate, and at the bar thereof to impeach* Governor Reed, and subsequently a commit-

tee reported that they had *proceeded to the bar of the Senate* AND IMPEACHED, as they were. directed to do, Harrison Reed, &c.

And so it clearly appears that the Assembly deemed that an impeachment was not effective until an accusation should be actually declared before the Senate, which body alone is authorized to entertain it.

The process of impeachment is likened in the books to the proceedings by indictment in the courts of criminal jurisdiction, and it is unnecessary to say that no indictment is of any effect whatever until it is presented to the court in actual, open, and legal session, and received and filed therein.

In the.light of the abundant precedents and authorities on the subject, under constitutional provisions precisely like our own in that respect, we cannot, in considering this case, so far deviate from established principles, rules, and beaten paths as to recognize a declaratory resolution of the Assembly as constituting an effective impeachment, until the declaration of impeachment or the accusation be made to and at the bar of the only tribunal authorized by the Constitution to receive and act upon it.

II. It then becomes necessary to inquire whether the Senate of this State was in actual legal session, duly organized and competent to transact business of any kind; for unless this be the fact, and a constitutional quorum be present, it could do no business as a House of the Legislature, except to adjourn and to compel the attendance of absent members.   There are authorities in point, viz. :

" There is a distinction between a corporate act to be done by a *definite* number of persons, and one to be performed by an *indefinite* number.   In the first case, it is to be observed that a majority is necessary to constitute a quorum, and that *no act can be done unless a majority be present ;* in the latter, a majority of any number of those who appear may act."   Angell and Ames on Corp., sec. 501–2.

" Where it is granted by charter that a corporation shall have

so many aldermen and so many capital burgesses, and that when one of the latter shall die, depart, or be removed, another shall be elected in his place by the mayor and aldermen and other capital burgesses' then surviving or remaining, or the greater part of them, the election must be made by a majority of the full members of aldermen and of capital burgesses; a mere majority of members of both bodies who happened to survive is not sufficient." Rex. v. Whitaker, 9 B and C, 648; 7 Cowen, 402.

"According to the authorities afforded by the English books relating to municipal corporations, there must be present at a corporate assembly, besides the President, a majority of each integral part, if composed of a *definite* number, and not merely a majority of the surviving or existing members of each class. Indeed, if there be not a surviving majority of the constitutional members, no corporate assembly, say those authorities, can be formed, and the functions of every meeting in which that class ought to participate are suspended." 4 T. R, 823; 6 do., 278; 4 East., 26; do., 307; Cowen's notes to ex parte Willcocks, 7 Cow., 410; 7 S. and R., 517; 9 Foster, 213; Angell and Ames on Corp., secs. 501, 506.

Barclay's Digest, p. 158, has a note in these words: "It was decided by the 37th Congress, to which several of the States had failed to send Representatives, that a majority of the members chosen constituted a quorum to do business." Journal I., 37, p. 117.

This may be a correct statement of the decision as made. Cushing cites numerous decisions of the Houses, showing more clearly the established rule. It is well known that the occasion referred to was that of the "secession" of several States, and the position assumed by Congress and the President was, that those States had abandoned their several State organizations and that they were "without legal governments," and of consequence the Congressional Districts therein were abandoned and destroyed, and thus in point of fact, by diminishing the number of Congressional Districts, and the insurrectionary States not

being entitled, in the then condition of affairs, to a representation in Congress, the number of Representatives necessary to form the Congress was reduced. This was the basis of the action referred to, and whatever action was had in the premises, was with reference to the then existing facts.

The Constitution of this State divides the State into twenty-four Senatorial districts. If by some great throe of the earth, the peninsular portion of the State were to be submerged, and thereby whole counties and districts actually destroyed, the number of Senatorial districts would be most assuredly reduced, and practically the number of Senators composing the Senate would be affected accordingly, and it would doubtless be considered a practical abolition of districts, which the " strong arm of the law" could not prevent. It is very seriously doubted, however, whether the resignation of seats by individual Senators, or the failure to elect by reason of a tie vote, or the death of a Senator, would have a similar effect. All precedents and authorities and sound logic forbid it.

But it may be said that the Constitution does not *expressly* establish the number of members of the Senate. The language used is, (Art. XVI., sec. 29 :) " There *shall be* twenty-four Senatorial Districts; which shall be as follows, * * * and each Senatorial District *shall be* entitled to one Senator." Art. IV., sec. 4, says, " Senators shall be chosen for the term of four years * * * The Senators elected at the first election from the Senatorial Districts designated by even numbers shall vacate their seats at the expiration of two years, and thereafter all Senators shall be elected for the term of four years, so that *one-half of the whole number* shall be elected biennially." Now to what do the words " whole number" refer ? The whole number of what ? Section 8 of the same article says, "*A majority of each House shall constitute a quorum to do business*, but a smaller number may adjourn from day to day," &c.

" Each House" is understood to mean, the members of the Assembly and of the Senate, selected from certain specified dis-

tricts, (not a *part* of the districts,) *duly convened and organized.* The word " House " refers to a duly organized body. The members do not form a " House " while they are at their homes, or when pursuing their private business in New York or London, but only when duly organized. A stranger inquires how many members compose the Senate or Assembly ? Where do we go to find the answer ? to the Constitution ? or must we go to the several counties and districts and ascertain who has died or resigned ? And even then we must deduct the number of ascertained vacancies from "the whole number " mentioned in the Constitution. " The whole number " must surely mean the aggregate of all the members, as the same may be ascertained by reading that instrument. If the words " the whole number " were intended to mean an indefinite number less than the whole, we should have this singular paradox: "*A majority of the whole of an unknown or indefinite number shall constitute a quorum.*"

But suppose we were to conclude that a majority of the whole number of members prescribed by the Constitution, might be construed to mean a majority of those only who might present evidence of their election. Even that, in the present case, would not lead to a result different from that which we reach by what we deem the proper construction, for in this case it appears that a Senator was elected in each of the twenty-four districts.

It appears of record that W. H. Kendrick was returned as elected to the Senate from the 23d district, Senators from all the other districts having been duly elected and sworn, and participated in the proceedings of that body. Mr. Kendrick's right to a seat being doubted, a committee was appointed to inquire into his eligibility, and on the 5th day of November, 1868, said committee made a report against his eligibility ; but it does not appear that the Senate acted upon such report, and for aught that appears upon the journals, Mr. Kendrick may be entitled to his seat. At any rate he was *returned as elected* to the Senate by a majority of votes, by the same authority which de-

55

termined the election of the other Senators. In case of his eligibility being denied by the Senate, it has sometimes been held by legislative bodies that the person who received the next highest number of votes at the election would be entitled to the seat, to wit : *according* to the practice adopted by the Constitutional Covention, as well as by one of the Houses of the Legislature, at its late session, and by the Legislature of a neighboring State ; and hence, if the rule of the House of Representatives of the XXXVIIth Congress is correctly stated, its application in the present case would not vary the result, if these precedents are good authority.

It cannot be seriously contended that a *resignation* of Senators, or their expulsion, can have the effect of creating a quorum to be composed of a less number than a majority of those *elected*.

Adopting such a rule, the resignation of all the Senators but three, or even one, would give to that insignificant number the power of a "majority of the whole number;" the twenty-four districts would all be represented in a single person, who would control all the legislation of the State ; raise or refuse to raise taxes ; overrule the wishes of the people represented in the Assembly ; override the veto of the Governor ; try impeachment; convict the Governor and Lieutenant-Governor ; pronounce them forever disqualified to hold offices, and vote himself governor as the successor of the Lieutenant-Governor ; prorogue the Legislature on refusing to agree to an adjournment; refuse to order elections to fill vacancies; and whatever crimes and misdemeanors in office he might commit, could neither be expelled from his seat as Senator or impeached as Governor. This case is extreme, it is true, but nevertheless, legally possible upon the hypothesis suggested. The people of Florida have not adopted a Constitution which, by any plausible construction, may place the government thus at the mercy of a minority of the whole number of members of which either House is to be composed.

Chief-Justice Marshall, in the case of Cohen vs. The State of

Virginia, 6 Wheaton, 390, says that a majority of the States may refuse to send Senators to Congress, and that the effect of this would be to *suspend* legislation ; that a *minority* of the States cannot effect such an obstruction of the Government, but that a majority may, and rightfully, under the Constitution, because a *majority* of States or people may always, of right, change the form of the government. The whole theory and the strength of our form of government rests in the right of the majority, instead of the minority, to make and unmake laws.

According to the "Journals" accompanying the Governor's communication, there were not present at any time during the called session more than twelve Senators.   We are of the opinion that that number is not a "majority of the whole number." That by the Constitution, a smaller number than a majority of the whole number may only "adjourn from day to day, and compel the attendance of absent members," and do not, therefore, constitute a duly organized Senate, capable of transacting any business whatever, save such as is mentioned in the Constitution, and as may be incident thereto in the process of organization. "A message from one House to the other cannot be received by the House to which it is sent; nor can an answer to a message be received by the House by which it is sent, unless a quorum is present." Cushing's Law and Practice of Legislative Assemblies, section 817.

We have seen that an impeachment is an accusation, duly made to a tribunal empowered to act upon it. The Senators present seem to have appreciated the situation, as, by the "Journals," it appears that they took no notice whatever of the proceeding in question.

We are, therefore, of the opinion that even upon the assumption that the proceeding of impeachment is not properly "legislative business," and that it may be presented at a called session, without the actually expressed consent of both Houses, there has not been an effective impeachment and suspension from the performance of official duties.

It is unnecessary to express any opinion as to the *status* of the sitting members who are supposed to have vacated and abandoned their places by accepting other offices. When the question arises it will doubtless be decided according to the law by the proper tribunal.

Respectfully submitted. E. M. RANDALL, C. J.

Opinion of Justice HART in response to the letter of the Governor, dated November 9, 1868.

In the matter of the inquiries made by the Governor "whether a Legislature of the State of Florida, consisting of a Senate and Assembly vested with the legislative authority of the State, has convened in Extraordinary Session under the proclamation of the Governor of November 3d, A. D. 1868," &c.

After much careful study and consideration, my mind has reached the same conclusions as those of the other Justices, and I concur fully with them in the opinions which they have given. The authorities quoted by them will be found to be in point, and their conclusions drawn therefrom to be sound.

Our Constitution does not, *in hæc verba* provide that the Senate shall consist or be composed of twenty-four members, but it contains provisions that by every fair and reasonable intendment mean the same. It provides that the legislative authority of the State shall be vested in a Senate and Assembly; that there shall be twenty-four Senatorial Districts; and it creates, defines, and numbers them, and provides that each shall be entitled to one Senator; and it also provides that a majority of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day and compel the absent members. To hold that these provisions of the Constitution mean that Senators from seven or three of these Senatorial Districts may under some or any circumstances constitute the Senate, cannot be a correct and sound interpretation

of the Constitution.   All reasonable contingencies are provided ;for in the phrase, " A majority of each House shall constitute a quorum to do business," &c.   Until a majority of the Assemblymen and Senators provided for by the Constitution assemble, there can be no Legislature.   The decision of the House of Representatives of the thirty-seventh Congress is not in point; the facts and circumstances inducing it were wholly and materially different; and yet the most abstract part of it, as it has been quoted from a digest, sustains us, for twenty-four Senators had been chosen.   No district had failed or refused to elect or choose a Senator.

A careful study of the Journals of the first Legislature under this Constitution will disclose the fact that both Houses have almost invariably made decisions which warrant our opinion.

I have searched in vain for precedents to sustain the theory that seven or three may constitute a quorum of either House. Never, until now, has any high functionary announced the doctrine that if a popular branch, in full quorum, goes to the bar of the Senate, by its committee or otherwise, to impeach the Executive, and finds but seven or three Senators there, it may, to that number, legitimately impeach the officer.

The Assembly has the sole power of impeachment; that is, it is the sole body clothed with authority to perform the several acts necessary to constitute impeachment; but it must perform them all before it can effect impeachment.   The sending a committee to the Senate to impeach the officer has always, in all the cases heretofore, been deemed essential to constitute impeachment, and if the Senate is not there, the act is not complete.

I could proceed at more length, but the arguments of the Chief-Justice and of Associate-Justice Westcott are so conclusive that it seems unnecessary.

Respectfully submitted.                        O. B. HART,
                        Associate-Justice Supreme Court.