[No. 279. April 2, 1889.]

THOMAS LYONS ET AL., APPELLANTS, v. JAMES B. WOODS, SHERIFF, ET AL., APPELLEES.

THIS CASE is similar to that of Chavez v. Luna, Collector, et al., decided at the January term, 1889, ante, page 183. The facts are similar, the same questions arose, and this case was affirmed for the same reasons stated in that case.

APPEAL, from a decree in favor of defendants, from the Third Judicial District Court, Grant County. Decree affirmed on the authority of Chavez v. Luna, Collector, et al.; BRINKER, J., dissenting.

The facts are similar to those stated in Chavez v. Luna, Collector, et al., ante, page 183.

WM. B. CHILDERS for appellants.

WM. BREEDEN, attorney general, for appellees.

LONG, C. J.—On the authority of Chavez v. Luna (decided at the January term, 1889) the judgment of the court below in this cause is affirmed.

BRINKER, J. (dissenting).—On the twenty-seventh day of August, 1885, the complainants filed in the court below their bill of complaint against the defendants, as follows: "Your orators, Thomas Lyons and Angus Campbell, partners, doing business under the firm name and style of Lyons & Campbell, Cornelius Bennett, Martin W. Bremen, and Joseph F. Bennett, all residents and citizens of the town of Silver City, in the county of Grant, and territory of New Mexico, and William J. Betterton, Charles L. Betterton, and Calvin Castlin, partners doing business at the town of Deming, in said county and territory, under the firm name and style of Betterton, Son & Co., in behalf of themselves, and all other taxpayers of said Grant county who shall come in and contribute to the expenses of this suit, do bring this their bill of complaint against James B. Woods, sheriff and ex officio collector of taxes within and for said county, and Richard Hudson, assessor of said county of Grant, and Angus Campbell, John Classen and Granville N. Wood, constituting the board of county commissioners of the said county of Grant. Your orators represent that the defendant James B. Woods is sheriff and ex officio collector of taxes; that the defendant Richard Hudson is assessor; and defendants Angus Campbell, and John Classen and Granville N. Wood are county commissioners, and constitute the board of county commissioners of the county of Grant, in the territory of New Mexico; and that all of said officers are residents and citizens of said county of

Grant. And thereupon your orators complain and say
that each of your orators is a taxpayer within said
county, and whose property is referred to and de-
scribed in a certain list and assessment roll now in the
hands of said defendant James B. Woods, prepared
from assessments claimed to have been regularly made
by the assessor of said Grant county, compiled under
the direction of the board of county commissioners of
said county, approved by said board, July 10, 1885,
and received by said James B. Woods, sheriff and col-
lector as aforesaid, on the thirteenth day of August,
1885, which said list, under the laws of the territory of
New Mexico, is the warrant and evidence of authority
under and by virtue of which he, the said sheriff and
ex officio collector, is about to collect and is collecting
the various sums of money making up the several items
of taxation as therein set forth. That among the items
of taxation in said tax list and assessment roll (being
for this present year, 1885) set forth, and upon which
each of your orators is therein noted as being taxed,
are the two items respectively described in said list as
'Penitentiary Bonds,' and 'Capitol Building Bonds,'
and that the sums of money set opposite the names of
each of your orators, and in the columns headed, respec-
tively, 'Penitentiary Bonds,' and Capitol Building
Bonds,' and levied as taxation upon your orators and
each of them for purposes partially described by said
column headings, and that the several assessments of
property of your orators respectively, and the amounts
severally taxed thereon for said partially described pur-
poses, are as follows, to wit:    Lyons & Campbell, total
assessable property, $158,310—penitentiary tax, $79.15;
capitol building tax, $126.64.    Martin W. Bremen,
total assessable property, $19,120—penitentiary tax,
$9.41; capitol building tax, $15.06.    Cornelius Bennett,
total assessable property, $6,900—penitentiary tax,
$3.30; capitol building tax, $5.28.    Joseph F. Bennett,

total assessable property, $7,490—penitentiary tax, $3.60; capitol building tax, $7,75. Betterton, Son & Co., total assessable property, $11,285—penitentiary tax, $5.64; capitol building tax, $9.03.

"Your orators further show that these items go to make up the sums total which the said sheriff and ex officio collector is about to collect from your orators, respectively, as the amount of taxation due from each for various purposes pretended to be warranted by law, and pretended to be due and payable for and during the year 1885; that the amounts of money thus in said list pretended to be due and payable upon account of penitentiary bonds, and upon account of capitol building bonds, and as taxation so levied for and on account of said items, are so claimed and levied and included in said list by virtue and under authority of pretended acts of the legislative assembly of said territory pretended to have been approved by the governor of said territory, which said pretended acts so pretended to have been approved are entitled and described, respectively, as follows: 'An act authorizing the building of a penitentiary in the territory of New Mexico, and regulating its management,' approved March 14, 1884, and, 'An act to provide for the erection of a capitol building in the city of Santa Fe,' approved March 29, 1884. Your orators further represent that said pretended taxes, under the pretended acts of the said legislative assembly aforesaid, and by the terms thereof, are to be assessed and levied in the same manner as other territorial taxes are levied and collected. Your orators further represent that the said pretended special taxes provided for under said pretended acts of the legislative assembly have been assessed by the tax assessor of the said county of Grant, passed upon by the board of county commissioners of said county sitting as a board of equalization as required by law, and are now on the tax lists in the hands of the said defend-

ant Woods, as collector of the county of Grant, which said tax lists in the hands of the said collector have attached to them the warrant provided by law requiring said collector to collect the taxes by said lists or rolls shown to have been levied, and that copies of said lists or rolls are now on file in the probate clerk's office of said county of Grant, and that all the steps required by law for the proper levy of taxes, with reference thereto, have been taken, so that the said lists and rolls in the hands of said defendant, the collector as aforesaid, of said county of Grant, and the copies thereof in the said probate clerk's office, on their face and by virtue of said pretended acts of the said legislative assembly aforesaid, and the general revenue law of the territory, are a lien upon the real and personal property of your orators in the said county of Grant, and are a cloud upon the title of your orators to their property, and that said taxation pretended to have been assessed under invalid and pretended laws of said territory, as hereinafter alleged, has the force and effect of personal judgments against your orators, and are liens upon their property as aforesaid, and said lists or rolls are by law given the effect of executions against the property of your orators so assessed. Your orators further represent that said pretended acts of the legislative assembly entitled as aforesaid, 'An act authorizing the building of a penitentiary in the territory of New Mexico and regulating the management,' approved March 14, 1884, and, 'An act to provide for the erection of a capitol building in the city of Santa Fe,' approved March 29, 1884, under which said assessment of taxation is made, and by virtue of which said pretended liens against your orators' property are asserted, and by virtue of which said pretended assessment rolls are claimed to have the effect of executions in the hands of the defendant as sheriff and ex officio collector of said county of Grant, are not, and never have become,

valid laws of said territory of New Mexico, for the
reason that the same never were introduced and passed
through the council of said legislative assembly when a
legal quorum of said council was present and partic-
ipating in the proceedings thereof, and for the reason
that a majority of a legal quorum of said council never
voted in favor of said pretended laws, so as to legally
pass the same through said body; and your orators
charge the facts to be that an act of congress of the
United States of America was passed and approved on
the fourteenth day of February, 1884, and thereby
became a law, which said act of congress, among other
things, provided that a session of the legislative assem-
bly of said territory should be held, and said assembly
convene, on the third Monday of February, A. D. 1884,
and said act of congress declared that the members
elected to the territorial legislature of said territory in
November, 1882, and all vacancies legally filled since
that time, if any, should be the legal members of the
legislature by said act authorized, subject to all valid
contests. Your orators further state that, in accord-
ance with the said act of congress, a pretended session
of said legislative assembly was held, commencing on
the third Monday of February, A. D. 1884.

"Your orators further state the fact to be and that
the same so appears by the published journal of the
proceedings of said pretended session of the council of
said legislative assembly that, upon the convening of
said council on the said third Monday in February, A.
D. 1884, only five members appeared who had regularly
received certificates of election, and were so shown to
be elected by the election returns of said election held in
November, A. D. 1882, to have been elected members
of said council, to wit: Jose Armijo y Vigil, of Socorro
county; Pablo Gallegos, of Rio Arriba county; W. H.
Kellar and Andres Sena, of San Miguel county; and
John A. Miller, of Dona Ana, Lincoln, and Grant

counties; and that thereupon the said five persons qualified as members of said council by taking the oath of office required by law, and signing the roll of members. Your orators further allege that by law the said council is composed of twelve members, and that seven thereof are necessary to constitute a legal quorum for the transaction of business. Your orators further allege that, after said five members had been sworn in as aforesaid, a motion was unanimously adopted by the vote of said five members only, and no more, that Thomas B. Catron, of Santa Fe county, be declared entitled prima facie to the seat from Santa Fe county, and that thereupon the said Thomas B. Catron took the oath of office as a member of said council, signed its roll, and thereafter acted as a member thereof; and your orators further allege that said Catron's seat was claimed by Henry L. Warren, of Santa Fe county, and that said Warren held a certificate of election as a member of said council from Santa Fe county, which said certificate was the first certificate of election issued by the county commissioners as evidence of the election of the member of said council from said county at said election held in said month of November, A. D. 1882, but that afterward said county commissioners, acting under protest, and compelled by an order of the district court in the said county of Santa Fe, issued a certificate of election to said Thomas B. Catron. Your orators further allege that they are not informed as to whom the election returns on file in the office of the secretary of the territory show to have been elected as a member of said council from said county of Santa Fe at said election. Your orators further allege that afterward, while said council was composed of the said five persons as aforesaid and the said Thomas B. Catron, and no others, a motion was therein introduced by the said John A. Miller, to the effect that Charles C. McComas and Jose Manuel Montoya be declared enti-

tled prima facie to the seats from Bernalillo county, subject to the right of contest, and that said motion was unanimously adopted by the vote of the said six members, and no more, who were then acting as aforesaid as members of said council.

"Your orators further allege that said Charles C. McComas and Jose M. Montoya held no certificates of election whatever as members of said body, but, on the contrary, Charles Montaldo and Francisco Perea held the certificates of election to the seats therein of the members from said county of Bernalillo, and that all the election returns of the election held in said month of November, A. D. 1882, both in the office of the county commissioners and in that of the secretary of said territory, showed, and still show, that said Charles Montaldo and Francisco Perea received a majority of the votes cast in said county at said election for members of the council from said county, and that said Charles C. McComas and Jose M. Montoya did not receive a majority of said votes so cast, and were not duly elected members of said council. Your orators further allege that the said Charles C. McComas, after the said election in November, A. D. 1882, had commenced proceedings as a contestant for the seat of said Charles Montaldo as a member in said council from Bernalillo county, and served his notice of contest on said Montaldo, and taken testimony under said notice of contest; and that said Jose M. Montoya had so commenced contest proceedings against the said Francisco Perea for the other seat of the member from said county of Bernalillo, and that said notice of contest so served and testimony so taken were duly filed with the secretary of the territory, and by him were transmitted and delivered to the said pretended council so organized as aforesaid; and at the time of the proceedings aforesaid the said papers relating to said contest were in the possession of the said secretary, and that long after-

ward, to wit, on the third day of April, A. D. 1884, the committee on elections of said pretended council reported to said body that the said contested election cases had been referred to them, and that they found that said McComas and Montoya were entitled to the seats then held by them in said body, which said reports are stated by the journal published by said body to have been on said day adopted.

"Your orators further allege that the said six persons aforesaid and the said McComas and Montoya constituted said council until on or about the 25th day of March, A. D. 1884, when the said W. H. Kellar absented himself from said body, and never afterward participated in its proceedings. And your orators further allege that, after the said Kellar had ceased to act with said body, J. Inocente Valdez, who was elected a member of the council from Colfax and Mora counties, took the oath of office, and participated in the proceedings. But your orators allege that at no time during the pretended session of said body did more than six persons, including the said Thomas B. Catron, take part in its proceedings, except the said Charles C. McComas and J. M. Montoya, unlawfully and arbitrarily seated as aforesaid. And your orators further allege that, including the said McComas, Montoya, and Catron, there were just eight members of said body present and voting when said bill aforesaid, entitled, 'An act authorizing the building of a penitentiary in the territory of New Mexico, and regulating its management,' was introduced and passed through its several readings in said body; that said last mentioned bill by the journal of said pretended council is alleged to have passed under a suspension of the rules of said council, on the 14th day of March, A. D. 1884, and which said journal shows that there were present on said day the said Jose Armijo y Vigil, T. B. Catron, Pablo Gallegos, W. H. Kellar, and McComas, Miller,

Montoya, and Sena, and no more; and that said journal does not show that said last mentioned bill was ever passed on any other day, and that on said day it had never been determined by any legal quorum, or by any other way, except by the illegal and arbitrary action of the six persons aforesaid, that said McComas and Montoya were entitled to said seats in said body. And your orators further allege that, including the said McComas, Montoya, and Catron, there were just eight members of said body present and voting when said bill aforesaid, entitled, 'An act to provide for the erection of a capitol building in the city of Santa Fe,' was introduced and passed through its several readings in said body; that said last mentioned bill by the journal of said body is alleged to have passed under a suspension of the rules on the 26th day of March, A. D. 1884, and which said journal shows there were present on said day the said Jose Armijo y Vigil, T. B. Catron, and McComas, Montoya, Gallegos, Sena, and Miller, and Valdez, and that of these Messrs. Catron, McComas, Montoya, Gallegos, Sena, and Armijo y Vigil voted in favor of the passage of said last mentioned bill, while Messrs. Miller and Valdez voted against the passage of the same; and that said journal does not show that said last mentioned bill was ever passed on any other day, and that on said day it had never been determined by any legal quorum, or by any other way, except by the illegal and arbitrary action of the six persons aforesaid, that said McComas and Montoya were lawfully entitled to seats in said body.

"Your orators further represent that said pretended acts of the legislative assembly, aforesaid, having been approved by the governor's signature attached thereto, and filed in the office of the secretary of the territory, and certified by said secretary as valid laws, legally passed by the legislative assembly of the territory, and that said acts have been incorporated and published in volumes of the laws of the territory, so that on their face

they seem to be valid laws, so as to give apparent
validity to the assessment of said taxation, and to the
lien on the property of your orators aforesaid, when in
truth and in fact the said pretended acts of the said
legislative assembly were never legally passed by said
legislative assembly, and are absolutely null and void,
and that by reason of the premises the said defendant,
collector as aforesaid, has acquired, and can acquire,
no authority in law whatever for exacting and collect-
ing the said pretended taxes from your orators, either
by virtue of said pretended acts of the legislative
assembly, or on the steps taken as aforesaid thereun-
der.    But your orators further allege that, nevertheless,
the said assessments and said rolls constitute upon their
face a lien, as aforesaid, upon the property of your
orators in said county of Grant, and are a cloud upon
the title of your orators to their said property.    And
your orators further represent that, if the said sums of
money so demanded by the said defendant by virtue of
said illegal assessments as aforesaid are paid by your
orators, the same will be entirely lost to your orators,
for the reason that said sums of money will pass into
the hands of the treasurer of the territory of New Mex-
ico, and be expended by virtue of the said pretended
acts of the legislative assembly in the erection of the
building provided for by the said pretended acts, or in
payment of indebtedness incurred in erecting the same,
and your orators will thereupon have no recourse upon
the territory of New Mexico for the recovery of the
same.    Your orators further represent that, should
they recover judgments against the territory therefor,
the said judgments would not be available to your
orators, for the reason that the warrants issued by the
territory against funds in the hands of the treasurer
are in excess of the amount of funds to meet the same,
and are constantly so in excess, and your orators could
not, therefore, recover the full amount so paid by them,

and your orators could not recover the same, for the reason that the warrants of the territory of New Mexico will not bring on the market their face value; and your orators further allege that any judgments they might obtain for the sums demanded of them, if paid by them, would be paid to them in warrants of the territory, depreciated as aforesaid.

"Your orators further allege that by the terms and provisions of said pretended acts of the legislative assembly assessments thereunder will be made against the property of your orators, and the payment of taxes thereunder be demanded each and every year during the official term of the defendant, and thereafter by his successors in office, for a period of twenty years, for the purpose of providing for the payment of the bonds and interest thereon by said pretended acts authorized to be issued, unless the invalidity of said pretended acts of the legislative assembly should in some manner be determined by some competent court, and the assessment and collection of said taxes be in some way restrained, and your orators be thereby subjected to a multiplicity of suits, and harassing and annoying litigation, to free their said property from said apparent liens, and the clouds thereby created on their titles to their property aforesaid.

"And your orators further allege that under the terms of the territorial revenue law, which by said pretended acts of the legislative assembly are made applicable to the assessment and collection of said tax so illegally exacted as aforesaid, the said defendant, as such collector, is empowered to sell your orators' real estate, and issue to the purchaser thereof a certificate of sale; and thereafter, before the making and delivery of a deed to such purchaser or assignee, your orators, in order to redeem the same, would be compelled to pay the sums shown to have been paid by the person to whom such certificate was issued, together with all taxes subsequently paid

by said purchaser, with interest thereon at the rate of three per cent per month.    Your orators further allege that after the lapse of three years the collector then in office, upon request of the holder of such certificate, would be compelled to execute a deed for the property by such certificate shown to have been sold, and said deed, when so executed and delivered, would be prima facie evidence of all the facts necessary to convey to the grantee named therein a valid title to the property thereby conveyed.    Your orators further allege that, should they permit their property to be sold under said illegal assessment, they would have to redeem the same within said period of three years, or the deed so authorized would on its face convey the title to said property. All of which your orators allege will more fully appear from an inspection of said revenue law of the territory, and the aforesaid pretended acts of the legislative assembly under which said illegal assessment is alleged to have been made, and reference thereto is hereby expressly made, and the same asked to be read as a part of this bill.

"Your orators further represent that the said defendant James B. Woods, as such sheriff and ex officio collector, is now demanding the payment of the said taxes so illegally assessed against your orators and their property, and is threatening, unless your orators pay the said taxes, to sell your orators' property, and thereby cast a cloud upon your orators' title.    And so threatening to sell the property of all other taxpayers in said county of Grant, unless said taxpayers pay the said taxes assessed under said pretended acts of the legislative assembly against their property.    And your orators further allege that the said defendant Richard Hudson, the assessor of said county of Grant, and the said defendant, the board of county commissioners of said county of Grant, will unlawfully assess and levy taxes against your orators and their property in said

county of Grant, for the ensuing year, A. D. 1886, under color of authority derived from said pretended acts of the legislative assembly, and they or their successors in office will continue to so illegally assess and levy said pretended tax from year to year unless restrained from so doing by some competent court, and will thereby certainly subject your orators and other taxpayers of said county to the payment of the taxes so illegally levied, or create clouds upon the titles of your orators and said taxpayers to their property in said county. Your orators further allege that the damages suffered by them by reason of the premises is irreparable, and will involve your orators in a multiplicity of suits.

"Wherefore, and inasmuch as your orators are remediless in a court of law, they bring this, their bill of complaint, in your honor's court of chancery, and pray that your honor will cause to issue, under the seal of this honorable court, a writ of injunction restraining and enjoining the said James B. Woods, sheriff and ex officio collector as aforesaid, and any of his deputies, his agents and employees, from in any manner further proceeding to collect, and from taking any steps to further the collection of, the said tax, and the items of said taxation so in the aforementioned list described as, and placed under, the headings of 'Penitentiary Bonds' and 'Capitol Building Bonds' for the year 1885; and that the said defendant Richard Hudson, assessor, and Angus Campbell, and John Classen, and Granville N. Wood, the board of county commissioners of said county of Grant, be restrained and enjoined by said writ of injunction from ever hereafter assessing any taxes against the property of your orators, and other taxpayers in whose behalf this suit is brought, for the purposes and under the authority of said pretended acts of the legislative assembly aforesaid, to wit, the act approved March 14, 1884, and entitled, 'An act author-

izing the building of a penitentiary in the territory of
New Mexico and regulating its management,' and the
act approved March 29, 1884, entitled, 'An act to pro-
vide for the erection of a capitol building in the city of
Santa Fe;' that said injunction be made perpetual; and
that such other and further relief be granted in the
premises as to your honor may seem meet and just.

"May it please your honor to grant unto your
orators the writ of subpoena, issuing out of and under
the seal of this honorable court, directed to the said
James B. Woods, sheriff, etc., and to the said Richard
Hudson, assessor of Grant county, and to the said
Angus Campbell and John Classen and Granville N.
Wood, commissioners as aforesaid of said Grant
county, and their successors in office, commanding
them, and each of them, on a day to be therein named,
and under a penalty to be therein inserted, to be and
appear before this honorable court, and then and there
full, true, and perfect answer make to the matters and
things contained herein; answer of said defendants
under oath being hereby expressly waived. Your
orators further pray that your honor will cause to be
issued forthwith, under the seal of this honorable court,
a preliminary writ, enjoining and restraining the said
defendant James B. Woods, sheriff and ex officio col-
lector, and any of his deputies, his agents and em-
ployees, from further proceeding to collect, and from
taking any steps to further the collection of, the said
tax, and the items of said taxation so in the aforemen-
tioned list described as and placed under the headings
of 'Penitentiary Bonds' and 'Capitol Building Bonds'
for the year 1885, until the further order of the court
in the premises; and that the said defendant Richard
Hudson, assessor, and Angus Campbell and John
Classen and Granville N. Wood, commissioners of said
county of Grant, be forthwith restrained and enjoined
by said writ of injunction last mentioned from hereaf-

ter assessing any taxes against the property of your orators, and other taxpayers in whose behalf this suit is brought, for the purposes and under the authority of said pretended acts of the legislative assembly aforesaid, approved March 14, 1884, and entitled, 'An act authorizing the building of a penitentiary in the territory of New Mexico and regulating its management,' and the act approved March 29, 1884, entitled, 'An act to provide for the erection of a capitol building in the city of Santa Fe,' until the hearing of this cause, or until the further orders of this court herein.''

Afterward, on the thirtieth day of November, 1885, the defendants appeared, and filed the following demurrer: ''These defendants say that they are advised that there is good ground of demurrer to said bill, and they do demur accordingly, and for cause of demurrer say that the said bill of complaint contains no matter of equity whereon the court can ground any decree, or give complainants any relief, as against these defendants; that the matters and things alleged in said bill of complaint, whereon complainants base their prayer for relief, are matters into which this court can not inquire, and upon which it has no jurisdiction to grant relief or render a decree against these defendants. Whereupon these defendants do demur thereunto, and pray judgment of the court whether they shall make answer to said bill otherwise than as aforesaid, and they pray to be hence dismissed, with their costs and charges in this behalf most wrongfully sustained.''

The demurrer was sustained pro forma, and a final decree passed dismissing the bill. From this decree complainants appealed.

The only question in this case presented for determination is the validity of the acts of the legislature mentioned in the bill. This question has been decided at this term in the case of Chavez v. Luna, ante, 183, by a majority of the court, adversely to the complain-

ants, and, unless the views of the court as expressed in the opinion delivered by Mr. Justice HENDERSON have undergone a change, the judgment in that case will be decisive of this, and the ruling and judgment of the court below be affirmed.

I assume in the outset that the court is of the same mind now as when that determination was reached, and shall discuss this case upon that assumption. If I could agree with my associates in their decision, there would be no necessity for saying more than that this case should follow and be determined by the judgment in that; but, with the greatest respect for their opinion, I am impelled, by what appear to me to be the soundest principles of law, to a different conclusion. It may be said that I should have recorded my dissent in that case. A sufficient answer to the suggestion is that I did not sit in that case in this court, and, of course, was not in a position to take part in the deliberations or judgment of the court.

It is admitted that the laws assailed were passed by a so-called "legislative assembly," one branch of which was organized by a less number than a majority of all the legal members elected and authorized by the act of congress providing for the holding of that session, and that this minority upon a mere motion admitted as members three other persons, who held no certificates of election from the proper authority, and in fact no certificates whatever, at the time of their admission, but were present in the attitude of contestants for the seats of three persons who held certificates showing, prima facie, their right to be seated and recognized as members of the council; that the contests so instituted were referred to a committee, but before such committee had reported on them the acts complained of were introduced and passed, and that the three persons so illegally seated by the minority voted upon the question of their passage; that

subsequent thereto the committee reported on the contests favorably to the persons holding the contested seats. The persons holding certificates, and who organized the council, and assumed to admit the three persons not holding certificates, were five in number. By section 5 of the act of congress of September 9, 1850 (9 St. at Large, p. 448, section 5), it is provided that the council of this territory shall consist of thirteen members. The act of June 19, 1878 (20 St. at Large, 193), limits the number to twelve and directs the legislative assembly at its next session to divide the territory into representative and council districts. The act of June 27, 1879 (21 St. at Large, 35), provides that the provisions of the act of June 19, 1878, supra, shall not be so construed as to impair or shorten the terms of office of any member of the legislative assembly until the territory shall have been redistricted as in that act provided, "nor until, at the next regular election thereafter, the twelve members of the council * * * shall have been elected, and their term of office begun." 1 Supp. Rev. Stat. U. S. 495.

On December 21, 1881, congress passed an act declaring the election held for members of the legislature on the second day of November, 1880, to be valid, although the election was not in accordance with the act of June 19, 1878, and validating all the acts of the legislature the members of which were chosen at that election, and requiring such legislature to proceed at once upon its assembling to apportion the representative and council districts provided for in the act of June 19, 1878, according to the census of 1880. This act further provided that, if such legislature should fail to make such apportionment, then it should be made in accordance with the provisions of the act providing for the reapportionment of the members of the legislature of Montana, Idaho, and Wyoming, approved June 3, 1880, which latter act is by this act made

applicable to New Mexico. It then requires the members of the board of apportionment to assemble at the capital, and complete their work on or before the first Monday of September then next ensuing. 22 St. at Large, 1. The act of June 3, 1880, referred to and adopted as a part of the act last cited, provides that the governor, the speaker of the house of representatives, and the president of the council, during the last session of the legislatures in Montana, Idaho, and Wyoming, are authorized and empowered to act as a board of apportionment of their respective territories, and requires them, or a majority of them, when assembled at the capital, to reapportion the members of the council and house of representatives in their respective territories upon the basis of population shown by the census of 1880. That they shall forthwith certify such reapportionment, and file it in the office of the secretary of their respective territories, and within ten days thereafter the governor shall issue a proclamation for an election of members of the legislature according to such apportionment. 21 St. at Large, 154. The act of February 14, 1884, provides that the members elected to the legislature in the year 1882, and persons selected legally to fill vacancies, shall be the legal members of the legislature for the year 1884, subject to all valid contests, and directs the legislature to convene on the third Monday of February, 1884. 23 St. at Large, 3.

I am not advised whether the directions of congress as to redistricting the territory have ever been complied with by the legislature, or by the officers specially empowered to perform that duty. In the session of 1880 there were thirteen members of the council (Acts, N. M. 1880, p. 11), and the same number in the session of 1882 (Acts, N. M. 1882, p. 7). The bill alleges that by law the council was composed of twelve members, and that seven constituted a

quorum. This is admitted by the demurrer to be true. From this it may be fairly presumed that either the legislature, or the governor, speaker of the house, and the president of the council, made the apportionment required by the acts of congress at some time before the session of 1884 was to convene. The evidence of such action has not been called to my attention, however, beyond the allegations of the bill. Whether the council consisted of thirteen members under the act of September 9, 1850, or of twelve as provided in the later acts, supra, seven would be a majority of all the members elected. None of the acts of congress relating to the organization of the territories prescribe what number of either house of the legislature shall constitute a quorum for the purpose of organization, or for the transaction of business, nor does the act of any previous legislature do so. In this state of the case, resort must be had to well settled principles applicable to all legislative and deliberative bodies.

It will not be pretended that any valid legislation could be enacted unless there was in existence and acting a legislature legal in both branches. The following proposition seems to be well established, namely: That a council could not admit persons to seats in its body, as members, unless there was then in existence, and acting, a legal council fully equipped and competent to legally discharge all of the duties contemplated by the law of its creation. In other words, the council must have an actual, potential, legal existence, before it could do any act as a council, such as passing upon the right of claimants to seats in its body, or discharging any other function, except, perhaps, to adjourn from time to time, and enforce the attendance of absent members. Such a body can only exist when there are present all, or a legal quorum of, persons prima facie entitled to seats. This does not conflict with the rule that each house is the judge of the elec-

tion returns and qualifications of its own members. That rule is subordinate to the primary rule that there must first be a legally constituted house, composed of persons prima facie entitled to seats, amounting in numbers to all, or a legal quorum of, the members elected. Until such a house exists, the principle does not apply, for there is no body competent to judge.

By section 1921, Revised Statutes United States, 1878, the secretary of the territory is charged with the duty of administering the oath to all members elect of both houses of the legislative assembly. This section impliedly gives the secretary the power, in the first instance, to determine who are entitled to seats in either house for the purpose of organization, and to the extent, at least, of securing a quorum. So, under its provisions, there could be no valid excuse for any number of members of the council less than a majority attempting to proceed with the organization, unless the secretary should be absent.

The constitution of the United States (article 1, sec. 5) provides that a majority of each house of congress shall constitute a quorum. This is but the declaration of a general principle of parliamentary law, recognized and enforced in all deliberative assemblies, in the absence of some other specific rule on the subject, as is shown by the following authorities. In Hatsell's House of Commons Precedents, a work covering the period from the year A. D. 1290 to the year 1818, and cited by Mr. Jefferson frequently in his Manual, it is said (volume 2, p. 125): "In general, the chair is not to be taken till a quorum for business is present, unless, after due waiting, such a quorum be despaired of, when the chair may be taken, and the house adjourned; and, whenever during business it is observed that a quorum is not present, any member may call for the house to be counted, and, being found deficient, business is suspended." Jeff., Man., sec. 6.

Roberts says: "A quorum of an assembly is such a number as is competent to transact its business. Unless there is a special rule on the subject, the quorum of every assembly is a majority of all the members of the assembly." Rules of Order, 113. Fland. Const. 82, 83: "In all councils and other collective bodies of the same kind, it is necessary that a certain number, called a 'quorum of the members,' should be present in order to the transaction of business. This regulation has been essential to secure fairness of proceeding. The number necessary to constitute a quorum of any assembly may be fixed by law, as is the case with most of our legislative assemblies; or by usage, as in the English house of commons; or it may be by the assembly itself; but, if no rule is established on the subject in any of these ways, a majority of the members composing the assembly is the requisite number. No business can regularly be entered upon until a quorum is present, nor can any business be regularly proceeded with when it appears that the members present are reduced below that number." Cush. Man., secs. 17–19. Mr. Wapples states the rule thus: "A quorum is a majority of the members. It is never less, under the common law of parliamentary procedure. Unless more than half of the members of the body are present, the body is not present. When more than half are present, the body is complete, and is as though all the members were present. If less than half could do business, it would be possible for deliberative bodies to be divided into two or more assemblies, each capable of doing business, and each liable to adopt measures contrary to those adopted by some other section." Parl. Prac. 158. "Legislative bodies in this country do not modify the common law requirement." Id. 228. See, also, 1 Story, Const., secs. 831–834; Cline v. Trustees, 20 Ohio St. 288; Southworth v. Railway Co., 2 Mich. 287, and cases

cited in note. In the last case, supra, the word "house" is held to mean a majority of all its members. Appellants cite The Executive Session, 12 Fla. 659, to the point now being discussed. The report is not accessible, and the case has not been examined. Appellees have filed no brief. After a very careful examination of the books at hand, I have been unable to find anything in conflict with the foregoing authorities. The principles stated in them are so well settled and familiar that I fear I may be open to the criticism of having laboriously argued upon "hornbook law." If so, my apology is that the occasion seemed to demand it.

These authorities settle the point that there must be a legal quorum before there can be a legal body, and that, in the absence of a special rule on the subject, a quorum must consist of at least a majority of all the legally elected members. If the council must consist of twelve or thirteen members, and if a majority of its members is necessary to constitute a quorum, and if but five members were sworn in by the secretary of the territory, and if these five, and no more, took it upon themselves to effect an organization of the council, and admit other persons not entitled prima facie to membership, then no legal council ever convened. To hold otherwise would be to countenance the most flagrant usurpation, and encourage a course of proceeding that would inevitably result in revolution. If five members of the council could determine who were entitled to seats, then three members might do so, or any other number less than a legal quorum. The history of the legislature of 1884 presents just such a state of affairs as Mr. Wapples predicts would result if less than a quorum were permitted to act for and in the name of the body. There were two so-called "councils" during that session. The one whose acts are now under review, although illegal, as I think I

have shown, secured the recognition of the house of representatives and of the executive. The other, although considered illegal by the executive and the house or representatives, held its meetings in the council chamber, while the recognized council held its meetings elsewhere; both bodies claiming to be the council, and causing endless confusion and uneasiness in the minds of the citizens of the territory.

In disposing of this part of the case, the court in Chavez v. Luna cite with evident approval the case of People v. Mahaney, 13 Mich. 481, and quote extensively from the opinion of Judge Cooley in that case. With due deference, I must be permitted to say that, in my opinion, the reasoning of the learned judge, and the principles there announced, have no application to this case. In order to properly estimate the value of a decision as a precedent, it may be stated as a rule that the facts upon which such decision is based should be attended to and carefully examined, and, if there be a substantial difference between those facts and the facts of the case to which the decision is sought to be applied as a precedent, then such decision ought not to be considered an authority. It has been ruled: "The language of a court must always be construed with reference to and in connection with the facts before it." Bell v. Railway Co., 4 Smedes & M. 549. Again: "The language of a decision is seldom, if ever, to be taken in a general sense, however general in the form of the expression, not mentioning exceptions and limitations. It should rather be understood as spoken in reference to the facts under consideration, and limited in meaning by those facts." Ram. Judgm. 251, and citations. In Brooks v. Marbury, 11 Wheat. 91, MARSHALL, C. J., says: "An opinion in a particular case, founded on its special circumstances, is not applicable to cases under circumstances essentially different." See, also, Quin v. Lloyd, 41 N. Y. 353. With

this rule in mind, the case of People v. Mahaney, when examined, will be easily distinguished from this, and shown not to be in point. In that case there was no question made as to the organization of the house of representatives, or that a legal quorum existed. The act assailed was one which, in order to have effect immediately upon its passage, the constitution required should receive the assent of two thirds of the members elected to each house. The plea set up a state of facts "which it is claimed shows that in the house of representatives the two thirds vote of sixty-seven members included several who had not been elected by a majority of legal votes, but who, it is also claimed by the pleas, were notwithstanding retained in their seats by an adjudication of the house in their favor." 13 Mich. 491. Upon this state of facts the remarks quoted in Chavez v. Luna from Judge COOLEY'S opinion are based. What was necessary to make a legal house, or what was the requisite number of members to constitute a lawful quorum, is not even suggested by the plea, nor hinted at in the opinion of the court. How many members of the house charged not to have been elected are embraced in the word "several" can not even be conjectured. If there was "an adjudication by the house" seating the persons who are charged in the plea not to have been elected, then there must have been a legal quorum of the house present participating in such adjudication, composed of at least a majority of the members required by the constitution to make a full house (Southworth v. Railway Co., supra); and, if so, then such quorum was competent to make the adjudication. Its action in that behalf was conclusive, and the courts could not inquire into the facts upon which it based its judgment.

There is nothing, I insist, in the case cited in conflict with the principle quoted above, that until there is a legal quorum of the house present the house is not present,

and, not being present, it could not adjudicate. The reluctance of the courts to investigate the acts of a legislative body, and the evils that would flow from a too close scrutiny of the details of their proceedings, as stated by Judge COOLEY, ought to have little weight, where there is an entire nonexistence of the body itself. Great evils would result were the acts of less than a legal quorum held to be beyond judicial inquiry. When once it is established that two or three or five or any number of persons, legally elected though they may be, but falling short of a majority or other legal quorum, can meet, and at their own sweet will say who shall and who shall not be admitted to take part in the passage of laws affecting alike the lives, liberties, and property of the citizens, without reference to whether the persons so admitted shall have at least a prima facie right to membership, then will the boasted security of constitutional government become a mockery.

This court quotes the seventh section of the organic act, to the effect that the legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States, and that all laws passed by the legislature shall be submitted to congress, and, if disapproved, shall be of no effect (sections 1850, 1851, Rev. Stat. U. S.), and concludes: "Whether in these general terms it was intended by congress to confer legislative powers upon the legislative assembly of New Mexico, with the usual and ordinary incidental judicial power to determine finally the election, qualification, and return of the members, we do not decide. It is sufficient to say that by the very terms of the organic act above quoted 'all of the laws passed by the legislative assembly and governor shall be submitted to the congress of the United States, and, if disapproved, shall be null and of no effect.' We must presume that, in obedience to the

fundamental law of the territory, these acts, together with all others passed at the session of 1884, were submitted to congress; and, there being nothing to show that they were disapproved, they have received the passive assent of congress, and have been in that way approved. Congress had plenary power over the subject, and, being approved by it, there is nothing upon which to ground the jurisdiction of the courts over the subject sought to be reviewed." Upon this conclusion the judgment rests. That this conclusion is not a necessary one, I think is capable of demonstration. While it is true, as intimated, but not decided, that congress has vested the territorial legislature and each house of it, by necessary implication, with the ordinary incidental judicial power to determine finally the election, qualifications, and returns of its members, and while it is also true that congress has plenary power to annul all acts passed by the assembly, and has reserved that power expressly in the organic act, I contend that the mere fact that congress has failed to exercise such power should not be construed as an implied assent to the acts of the legislature submitted to it.

An examination of the legislation of congress from September 9, 1850 (the date of our organic act), down to the present time, will show that but three laws passed by the legislature of this territory have ever been disapproved (16 St. at Large, 44, 278; 20 St. at Large, 280); and the disapproval was not because of any illegality in the organization of the legislature, nor in the regularity of the proceedings attending their passage, but solely because the policy of the laws was not such as to commend them to congress, or because they contravened the organic act. So far as anything to the contrary appears, the legislature in each instance was legally organized, and every step necessary to the legal passage of the laws in regular form was taken,

from the introduction of the bills to their final passage. The only instances in which congress has been called upon to pass judgment upon matters occurring here, because of irregularity, so far as I have been able to examine the question, were on March 26, 1867, when it passed an act violating the laws passed by the legislature in 1866, and which had been signed by the acting secretary instead of by the governor, as required by section 1842 of the organic act (15 St. at Large, 23), and on December 21, 1881, when it passed an act approving and making legal the election of members of the legislature in the year 1880 (22 St. at Large, 1). This action by congress tends strongly to prove that congress did not consider a mere failure to disapprove an invalid law an approval of it. In this case there is nothing to show that congress had any knowledge of the manner in which the council was organized. The organic act requires the secretary of the territory to transmit to the president one copy of the laws and journals, and to the president of the senate and speaker of the house two copies of the laws, for the use of congress. Sections 1844, 1850, Rev. Stat. U. S. Congress, having before it the laws under consideration, may have been satisfied with their policy, and may have deemed them proper and beneficial to the inhabitants of the territory, being ignorant of the constitution of the bodies by which they were passed; whereas, if it had been informed of the methods resorted to in organizing the counsel, it might and probably would have disapproved them, on the ground that the action of the organizers of that body was revolutionary, and calculated to provoke discord and dissatisfaction among the people. That the mere nonaction by congress is not to be taken as an approval of the acts of the legislature, so as to preclude judicial investigation, has been expressly held by the supreme court of the United States in a very recent case. In Stoutenburgh

v. Hennick, 9 Sup. Ct. Rep. 256, it appeared that certain acts of the legislative assembly of the District of Columbia had been submitted to congress, and portions of them repealed and disapproved. In the acts of congress disapproving such portions, nothing was said about the portions not disapproved. It was contended on the argument that, as congress had expressly disapproved a part of those acts, it thereby impliedly approved the remainder of them. In passing upon this point Mr. Chief Justice FULLER says: "Although by several acts congress repealed or modified parts of this particular by-law, these parts were separably operative, and such as were within the scope of municipal action, so that this congressional legislation can not be resorted to as ratifying the objectionable clause, irrespective of the inability to ratify that which could not originally have been authorized." Here is a case of the entire law being before congress. It repeals a part, which it was competent for the legislative assembly to enact, and leaves unrepealed a part, which the legislature could not lawfully enact, and which congress could not empower it to enact; yet the court says, independent of the power of congress to ratify the portions of the act not noticed in the repealing law, its mere nonaction can not be held or presumed to be a ratification. This case is conclusive of this point. It is but just to the learned justice who wrote the opinion of the court, and to the other justices who concurred in the case of Chavez v. Luna, to say that the case of Stoutenburgh v. Hennick, supra, was not before this court when the judgment was rendered, and that none of us was aware of the ruling in it. Upon the whole case, I am of the opinion that the case of Chavez v. Luna should now be overruled, and that the judgment of the court below in this case should be reversed.